**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**

| | | |
|---|---|---|
| Sears Outlet Stores, L.L.C. n/k/a | : | No. |
| American Freight Outlet Stores LLC, | : | |
| v. | : | |
| | : | JURY TRIAL DEMANDED |
| Capgemini America, Inc., | : | |
| successor in interest to Capgemini | : | |
| U.S. LLC | : | |
| | : | |
| | : | |

## COMPLAINT FOR INJUNCTIVE AND OTHER RELIEF

Plaintiff, Sears Outlet Stores, L.L.C. n/k/a American Freight Outlet Stores LLC ("Outlet") for its Complaint against Capgemini America, Inc., as successor in interest to Capgemini U.S. LLC ("Capgemini") alleges as follows:

## INTRODUCTION

1.      This dispute arises from Capgemini's failure to timely and adequately design, build and deliver a bespoke "Enterprise Solution" information technology ("IT") system to fully integrate and manage all of Outlet's business processes.  As of the date of this Complaint, Outlet has paid more than $70 million to Capgemini for an IT project that Capgemini claimed it could design, build and implement in 18 months at a cost of just over $19 million. Yet five years after signing a contract with Capgemini, Outlet remains without a fully functioning Enterprise Solution.  Capgemini has now purported to terminate the MSA, asserting that Outlet has failed to pay certain disputed invoices.  Outlet does not agree with that contention, but the MSA is clear: even if the MSA is terminated by Capgemini for cause, Capgemini is obligated to provide Termination Assistance as defined in the MSA.  Capgemini is explicitly refusing to provide such

assistance and Outlet brings this Complaint seeking immediate injunctive relief to maintain the *status quo* -- as the parties explicitly contemplated in the MSA -- and to recover damages for Capgemini's fraud, breach of contract, and willful abandonment of its obligations under the MSA.

2.      Historically, Outlet (formerly Sears Hometown and Outlet Stores, Inc.) shared IT and business management systems with its former parent, Sears Holding Corporation (now known as "Transform Holdco, LLC", hereinafter, "SHC") to facilitate its retail and back-office business functions (the "Legacy Business Systems"). Outlet paid SHC for its use of the Legacy Business Systems, a practice which continued after SHC spun off Sears Hometown and Outlet Stores, Inc. on or about October 11, 2012. Because the IT and business management processes that run the Legacy Business Systems were developed over time, and were not created specifically for Outlet's business, they are inefficient, expensive and largely unintegrated with Outlet's business.

3.      This lack of integration led to challenges and inefficiencies such as different systems employing different data formats that were not necessarily compatible, the need for complicated and *ad hoc* interfaces to move data from one system to another, and an undue reliance on manual processes, rather than automated electronic ones. Equally important, the technology underpinning the Legacy Business Systems had become costly and increasingly outdated.

4.      By 2013, Outlet determined that the long-term cost of using the Legacy Business System was not sustainable. It envisioned a new, integrated, comprehensive system designed specifically for Outlet – supporting all of Outlet's various IT and business functions, including finance and accounting processes, human resource activities, payroll activities, merchandising

and inventory management, website and e-commerce transactions, in-store point of sale transactions, data analytics and business intelligence functions, customer care and helpdesk services. Because Outlet envisioned the new system as a complete replacement for the Legacy Business Systems, Outlet could not risk placing the new system into operation without assurance that its existing infrastructure would not suffer.

5.     In 2013, Outlet issued a request for proposal ("RFP") to design, build, and deliver a new IT and business system. Although the new business platform (which would come to be called the "Enterprise Solution") was to be built and delivered in several "phases" or "releases", the objective of the entire project was the construction and launch of a complete, comprehensive, integrated, and fully functioning IT system for all of Outlet's business operations, with all releases implemented and fully operational for actual business use by the end of the contract term.

6.     Capgemini ultimately bid to: (i) design, develop, and implement Outlet's Enterprise Solution; and (ii) offer post-implementation outsourcing services to support all of the business processes that would operate using the Enterprise Solution. Fully aware that a timely and successful Enterprise Solution was essential to Outlet, Capgemini represented throughout the RFP process, and specifically on September 27, 2013, that it "has the capabilities and depth in retail systems integration and transformation" and that it possessed "extensive experience" with the design, build, and implementation of complex IT and business systems. Capgemini proposed a bespoke system that would primarily utilize the cloud, and run upon a platform licensed by third-party NetSuite, Inc. ("NetSuite").

7.     Outlet selected Capgemini's bid and, on April 4, 2015, Outlet and Capgemini entered into a Master Services Agreement for Business Process and Information Technology

Services (the "MSA" or "Agreement").  A copy of the MSA and Schedule 16 is attached as Exhibit A.

8.      The Agreement provided that Capgemini (or the "Service Provider") would fully design, build, and deliver the Enterprise Solution within 18 months at a cost of just over $19 million.  The Agreement further expressly provided that Outlet "is relying on Service Provider's experience to design and build an Enterprise Solution that supports Customer's business processes within the scope of the Agreement."  MSA at Attachment 13-A (Implementation Services), § 2.1.

9.      Much like a general contractor, Capgemini assumed final contractual responsibility and management responsibility for virtually every important phase of the project, from validating the business requirements and functionality to be built into the system, the architecture and design of software, providing software programmers to write custom code for the system, performing system testing, and evaluating and retaining third party vendors such as NetSuite.

10.     As the project progressed, however, Capgemini repeatedly and wrongfully disclaimed responsibility for continuing software and hardware defects and functionality problems.  Instead, Capgemini improperly blamed Outlet for the project delays and asked Outlet to take responsibility for Capgemini's project management duties, including staffing and expertise.   Capgemini consistently refused to perform tasks that were essential even to a basic IT platform unless Outlet agreed that work was outside the scope of the MSA, thus requiring additional payment.  Capgemini also falsely represented that components of the Enterprise Solution were complete and ready for implementation before they had been fully tested so that they could obtain approval and sign-off from Outlet, who relied on Capgemini's representations

4

and only later realized that, when used in an actual environment, the components were poorly designed and did not properly function. Capgemini's motivation was clear – if Outlet declared that a phase was complete, Capgemini would demand payment for that particular phase.

11. Capgemini repeatedly made false and misleading statements that the envisioned Enterprise Solution was close to completion, and that only minor adjustments to the schedule were necessary before final and integrated Enterprise Solution would be fully operational. Capgemini made these statements knowing they were untrue or with reckless disregard for their truth. In this manner, the build phase of the Enterprise Solution, which Capgemini agreed would take no more than 18 months, dragged on for years. Outlet relied on Capgemini's misrepresentations to continue working with Capgemini and to make substantial additional financial payments beyond the original fixed contract price in what proved to be a futile attempt to obtain a complete and fully functioning system from Capgemini.

12. Instead, Outlet has been forced to build out its own in-house IT team, engage in daily manual interventions to keep the system running, and to continue to support many of its business processes through a collection of aging, costly Legacy Business Systems, incurring millions of dollars of server, support, and maintenance costs.

13. Capgemini has failed to provide the Enterprise Solution it committed to build and Outlet has suffered enormous harm as a result. The Enterprise Solution has been, and is, plagued with critical, complex, extensive, and essential functionality issues. The Enterprise Solution lacks basic finance functionality, takes weeks to update thus causing interruptions in sales, cannot reliably track or store inventory data, requires extensive manual manipulation to perform basic tasks, and, shockingly, operates even more slowly at the retail level than the SHC legacy system. It is not a sustainable long-term solution for Outlet as a business.

14.     Despite this, Capgemini has continued to demand final payment and on April 7, 2020, terminated the agreement.  Although its right to do so is in dispute between the parties, the MSA is unambiguous.  Even if the MSA is terminated for cause, and even if the parties proceed to litigation, Capgemini remains under an obligation to provide specifically defined Termination Assistance to Outlet for up to two years.  Ex. A at § 15.7 and Schedule 16.

15.     One of the most critical items of assistance required by Outlet is a continuing license to the NetSuite platform, upon which the Enterprise Solution is built.  Capgemini does not dispute that a NetSuite license is essential for Outlet to operate its business.  Capgemini holds that license and has claimed that it will terminate on April 22, 2020, leaving Outlet without access to software necessary to operate its IT infrastructure.  Outlet will be unable to run its business.  The MSA confirms the parties' agreement that the failure of Capgemini to provide Termination Assistance will cause irreparable harm to Outlet, and can be remedied by injunctive relief.

16.     Accordingly, Outlet brings this case against Capgemini for specific performance and to recover the millions of dollars in damages that caused by Capgemini's misrepresentations and breaches of the MSA.

**THE PARTIES**

17.     Plaintiff, Sears Outlet Stores, LLC n/k/a American Freight Outlet Stores LLC ("Outlet"), is a Delaware corporation with its principal place of business at 5500 Trillium Boulevard, Suite 501, Hoffman Estates, Illinois.  In 2019, Outlet acquired a Ohio-based company by the name of American Freight Group, Inc., and changed its name to "American Freight Outlet Stores LLC".

18.     Outlet operates retail and online stores selling new and refurbished appliances and electronics to consumers.

19.     In October of 2019, Sears Hometown & Outlet Stores, Inc. ("SHO") sold Outlet to Franchise Group Newco S LLC ("Franchise Group").  Shortly thereafter, SHO assigned its rights in the MSA and all amendments thereto to Franchise Group.  In turn, Franchise Group assigned the MSA and all rights therein to Outlet.

20.     Defendant, Capgemini America Inc. ("Capgemini"), is a New Jersey corporation with its principal place of business at 79 Fifth Avenue, 3rd Floor, New York, New York. Capgemini holds itself out as a company that offers technology services, including the design, development, and implementation of complex IT systems to support business infrastructure.

<u>**JURISDICTION**</u>

21.     This Court has subject matter jurisdiction over this dispute under 28 U.S.C. § 1332(a) as there is complete diversity between the parties and the amount in controversy, exclusive of interests and costs, exceeds the sum of $75,000.

22.     This Court has personal jurisdiction over Capgemini and venue is proper pursuant to 28 U.S.C. § 1391 and for the reason that the parties agreed to litigate all actions or proceedings relating to the Agreement exclusively in the jurisdiction of courts located within Cook County, Illinois.

<u>**FACTS AND BACKGROUND COMMON TO ALL COUNTS**</u>

23.     On April 4, 2015, Outlet and Capgemini entered into the MSA.

**I.      The RFP Process and Capgemini's Extensive Due Diligence**

24.     The MSA arose out of a competitive bidding process that started with Outlet's issuance of an RFP in 2013, to which Capgemini responded with a series of related proposals

beginning in July 2013 and culminating in September 2013, with Capgemini's proposal for development and implementation of a new, modern, integrated, and comprehensive Enterprise Solution to be used to manage Outlet's business processes.

25.     On or around July 10, 2013, Capgemini sent Outlet a presentation titled "Solution Definition for Divesture from Sears Holding Corporation Shared Services – Proposed Approach."   Capgemini represented, among other things, that: (i) it "knows how to do divesture-based transitions; the team has the methodology, the industry experience, and the right technology;" and (ii) its "Business Process Outsourcing ("BPO") unit has experience managing the back office for some of the largest brand names in the world."  Capgemini's representations regarding its experience to design and build the Enterprise Solution were material, and Outlet relied on that representation as inducement to enter into the MSA.

26.     On our around September 27, 2013, Capgemini submitted an even more detailed 117-page "Separation Solution Report" (the "Capgemini Solution").  Capgemini represented that it understood that Outlet desired to "[i]mplement an aggressive but practical timeline allowing Outlet to dynamically grow their business in the new customer driven market utilizing a new solution platform on foundational integrated business processes."  The Capgemini Solution was based on its seven-week, comprehensive due diligence process during which Capgemini fully assessed and evaluated Outlet's business objectives, IT strategies, and operations:

(i)      In week one of its diligence, Capgemini reviewed all 17 streams of the Service Agreement between SHC and Outlet.

(ii)     In the first two weeks, Capgemini coordinated 33 stakeholder discovery sessions onsite at Outlet during which Outlet provided insight into existing processes, technological and organizational limitations, including potential solution paths for specific areas.

(iii)    In week two of its due diligence, Capgemini brought all Outlet stakeholders together to ensure Capgemini was aligned with Outlet's priorities.

     (iv)    During weeks 3 to 7, Capgemini held stakeholder meetings with Outlet personnel in the following areas: (i) comprehensive retail; (ii) human capital management; (iii) corporate administration; (iv) ecommerce; and (v) information management (business intelligence) and used that information to develop a Solution Architecture/Operating Model for each service.

     (v)    Specifically, during weeks 6 and 7 of its diligence, Capgemini studied its findings and created deliverables related to solution architecture that it reviewed with Capgemini global experts.

     (vi)    The diligence also included store visits in which Capgemini experienced the entire back end operation from end to end including a breakdown of its point of sale system and user experience.

27.    Capgemini made it clear in submissions to Outlet following its due diligence that it understood that the essential purpose of the project was the construction and delivery of a complete and integrated system that would replace the entirety of the Legacy Business Systems, expressly stating on October 30, 2013 that it appreciated "the complexity of this separation program that Outlet will undertake and understands that the program will touch all aspects of its business operations."

28.    Specifically, Capgemini represented that it recognized that project management and project management processes were "critical to the success of the project," and that Capgemini had a "well-established and proven approach that will benefit Outlet…"   Capgemini touted its "extensive" experience with "complex divestures [sic] and conversions, especially with those driven by a formal Services Agreement" and represented that it had the capabilities and depth to manage this complex project and was, "uniquely qualified to guide Outlet through this challenge" given that experience.  Capgemini also represented that its proposed team had "relevant experience" and that "our methods, our techniques, and our program, and change management experience with similar large-scale transformation projects offer the risk mitigation

9

and project management rigor that are necessary to make this program successful" and to provide a final Enterprise Solution within 18 months.   These representations were inaccurate.

29.     Critically, Capgemini differentiated its solution by proposing a "unique approach" that utilized NetSuite as a cloud based provider of "a single application" for Outlet's business units.  Capgemini represented that it had the ability and a plan to implement an Enterprise Solution for Outlet with "ALL required functionality" and that NetSuite could support the core of the Enterprise Solution, including point of sale operations, finance, merchandising, and purchasing.

**II.     Capgemini's Misrepresentations Concerning its Experience, Ability and Intentions**

30.     Despite its intention that Outlet rely on these representations, Capgemini had: (i) no intention or ability to staff the project as prescribed; (ii) no intention of creating and implementing an Enterprise Solution within a 18 month period; (iii) insufficient proficiency in implementing a NetSuite solution; (iv) no intention of abiding by its low cost estimates; and (v) a lack of experience in creating, designing, and implementing an Enterprise Solution of this magnitude.  Yet, it concealed its knowledge of those facts from Outlet.

31.     In April 2015, in good faith reliance on the numerous representations identified above, including Capgemini's representations that it possessed the NetSuite expertise and solutions to provide a superior Enterprise Solution "that can accommodate business evolution over the next 5 to 10 years," Outlet selected Capgemini to design, build, and implement the Enterprise Solution.  At the time it made its decision to select Capgemini, Outlet did not know that Capgemini had withheld and failed to disclose material information about its inability to perform the promised and required services.  Had Outlet known the truth, it would not have selected Capgemini.

32.     Capgemini included many of the material representations from Capgemini's proposals, including its proposed architecture and implementation plans and its representations as to the timeline and costs, into the parties' final MSA.  Indeed, the MSA specifically provided that it was based upon Capgemini's proposals in response to Outlet's RFP.  Ex. A at p. 1.

33.     The MSA contemplated just over a $19 million price for a final Enterprise Solution.  At the time Capgemini agreed to build the Enterprise Solution for that amount, it knew that it would charge Outlet many millions more for the same solution, but Capgemini also concealed that fact from Outlet.

## III.    The Project Suffers from Capgemini's Inadequate Staffing and Management

34.     In its 2013 discussions with Outlet, Capgemini emphasized its deep expertise and knowledge of "complex divestures and conversions, especially with those driven by a formal Services Agreement."  It represented that it could use that expertise to "increase implementation success."

35.     Capgemini further agreed that it would:

(i)      Appoint (i) a "sufficient" number of individuals to the Contract Staff so that the Services are provided in accordance with the Agreement and (ii) only individuals with "proper" education and experience and with "suitable" training and qualifications to perform the Services to which they are assigned. Ex. A at § 7.4.

(ii)     Perform the Services in a timely, workmanlike manner in accordance with industry standards. Ex. A at § 20.2.7.

(iii)    Have and maintain adequate facilities, and equipment as necessary to perform the Services in an efficient, professional, workmanlike and timely manner. Ex. A at § 20.2.6.

(iv)    Provide Key Service Personnel who were expected to be dedicated to the Enterprise Solution and could not be replaced or reassigned without Outlet's consent. Ex. A at § 7.2.

11

(v)    Discharge its responsibilities to achieve the following goals:  (a) efficient, low cost deliver of excellent service to customer, and (b) regular access to Service Provider's skilled personnel, knowledge, best practices and other capabilities and resources.  MSA at Schedule 17 (Governance).

36.    As part of its improper inducement, Capgemini misrepresented its project management capabilities, representing for example that it brings "[p]rogram management & delivery methodologies" that would benefit Outlet.  Outlet relied on those representations and commitments in selecting Capgemini.

37.    Throughout the project, however, Capgemini failed to consistently assign or maintain either the right project management staff or employ satisfactory project management approaches.

38.    In reality, and unbeknownst to Outlet, Capgemini did not have the ability or the personnel to staff the project with sufficiently knowledgeable personnel.  Had Outlet known this fact, it would not have selected Capgemini to execute the Enterprise Solution.

39.    Outlet repeatedly requested that Capgemini identify Contract Executives and Key Personnel, but those requests were ignored.  Further exacerbating staffing problems, was Capgemini had no consistent Contract Staff.  Despite requests from Outlet for a list of Capgemini team members, Capgemini never provided such a list.  Personnel would roll on and off the project with no explanation and no knowledge transfer.  Capgemini's decision to roll off Contract Staff once it had unilaterally determined that a phase was complete created a knowledge gap when the project entered the critical "go-live" testing and implementation phase.

40.    This lack of knowledgeable personnel and constantly changing project teams, led to inefficiencies and breaks in "project memory".  The constant turnover, lack of knowledge transfer, and inadequately trained employees resulted in significant delays and the expenditure of millions of dollars by Outlet, which was forced to hire and build out its own internal IT team to

12

address technical issues that arose during the project, and that Capgemini personnel failed to address.

**IV.     Capgemini's Mismanagement of its Own Contract Obligations**

41.     In fact, Capgemini even formally requested in writing that Outlet perform some of the critical Capgemini obligations to achieve functionality because Capgemini was unwilling or unable to provide adequate qualified resources.

42.     In 2019, when Outlet was able to build its internal IT team sufficiently to manage the project as Capgemini should have done, Outlet realized that Capgemini was charging exorbitant and unexplained hours – totaling hundreds of thousands of dollars per month – on tasks that should have been managed for a fraction of the cost.

43.     For example, Capgemini was charging Outlet approximately $120,000 per month to manage ERP functions, cloud setup, and downloading data to store registers related to pass-through Amazon Web Service (AWS) functions.  When Outlet's internal team took over those tasks, it realized that the pass through cost of those tasks was actually $18,000-$20,000 per month.

44.     More than fifty-percent of Capgemini personnel were also logging in 14 to 16 hours per day of time that was then billed to Outlet.  However, most of those employees were working at Outlet's offices, and were not actually even at the premises for those hours. Capgemini also did not follow the procedures in the MSA for travel costs.  Invoices to Outlet include tens of thousands of dollars in unexplained and unaccounted for travel costs for low-level personnel.  Since the project began, Outlet discovered that Capgemini employees traveled to Illinois for this project and incurred unnecessary costs by renting luxury cars and booking expensive hotel rooms.

45.     When Outlet raised these issues with Capgemini, and insisted that the parties implement a "check" procedure so that Outlet could verify those hours and costs prior to payment, they were ignored.

**V.     Capgemini Fails to Provide an Operative Enterprise Solution**

46.     Capgemini agreed that it is "responsible for designing and building an Enterprise Solution that supports the activities, processes, and responsibilities needed by Customer to run the Customer's business pursuant to the Agreement…"  MSA at Attachment 13-A (Implementation Services), § 2.1.  The MSA further expressly stated that Sears Outlet was "relying on [Capgemini's] experience to design and build an Enterprise Solution that supports [Outlet's] business." The MSA also provided for a total cost of just over $19 Million to complete the build of Enterprise Solution (the "Build Fees").  MSA at Schedule 5.  Specifically, the MSA provides that the Build Fees represent all fees associated with the Implementation and Transition Services phase, including the development of the Enterprise Solution, "which will be completed within an eighteen (18) month timeline."  MSA at Schedule 5, § 1.0.

47.     The Parties split the Build Fees into two components:  (i) a monthly fixed fee of $783,304 per month for 15 months, and (ii) a series of deliverable-based payments, which Outlet would pay to Capgemini upon Outlet's acceptance of the deliverable.

48.     In addition to the Build and other Fees, Outlet was completely reliant on Capgemini providing a reasonable and accurate level of Integration and Customization Effort ("ICE Fees"), which represented the time spent by Capgemini personnel to complete the Enterprise Solution.  Capgemini expressly represented to Outlet that it would take 45,000 hours of Integration and Customization Effort ("ICE Fees") to complete the Enterprise Solution.  Specifically, Capgemini represented:

> Service Provider, based on its experience and expertise, the information reasonably available to it, and as requested by [Capgemini] from [Outlet] and the SP Procured Vendors, believes, prior to Build, that 45,000 person hours or less of Integration and Customization Effort will be required to complete the Enterprise Solution in accordance with the Design Documents.

MSA at Schedule 5, § 4.3.1.

49. If, in good faith, Capgemini expended reasonable additional Integration and Customization Effort to complete the Enterprise Solution, the parties developed a process whereby Capgemini could receive compensation for additional effort.

50. Capgemini's misrepresented that 45,000 hours or less of Integration and Customization Effort would allow for completion of the Enterprise Solution in accordance with the Design Documents. It was intended to induce and did induce Outlet to enter into the MSA. In fact, Capgemini knew, but failed to disclose, that the level of effort would be hundreds of thousands of hours greater.

51. The amount of Integration and Customization Effort actually expended by Capgemini to Build the Enterprise Solution has now exceeded 230,000 hours. As a result, Capgemini has invoiced Outlet millions of dollars in additional Build Fees. Significantly, had Outlet known the true cost of the Build, Outlet would have never entered into the MSA with Capgemini, and would have sought an alternative solution. And, to make matters worse, the Build is still not complete.

52. Once Outlet had committed to the project and invested significant resources in it, and shortly after the project got underway in April 2015, it became apparent that Capgemini could not execute on deliverables as it has promised. Throughout the life of the project, when various contingencies arose, Capgemini asked Outlet to accommodate it by agreeing to schedule extensions and additional payments.

53. Only six months into the project, Capgemini disclosed that it had nearly reached the 45,000 person hours ICE Ceiling, and falsely claimed that the ICE Ceiling applied only to technical specifications, coding, and unit tests and did not cover functional design, and functional unit and integration testing. The MSA clearly provides that "45,000 person hours or less of Integration and Customization Effort will be required to complete the Enterprise Solution in accordance with the Design Documents." MSA at Schedule 5, § 4.3.1.

54. Despite its seven-week due diligence period, and the detail of both the Capgemini Solution and the MSA, Capgemini informed Outlet that the project was more complex and required more customization that it had initially anticipated. For example, Capgemini claimed it had no understanding that the Enterprise Solution needed to link with SHC's system to handle issues such as in-store returns of SHC merchandise. These claims, however, were directly contradicted by Capgemini's representations in its Capgemini Solution that its proposed Enterprise Solution would have the "[a]bility to manage returned product from multiple Sears banners."

55. These delays, and Outlet's increasing concerns over costs, missed benchmarks, and personnel issues, culminated in a First Amendment to Master Service Agreement for Business Process and Information Technology Services (the "First Amendment") with an effective date of December 11, 2016, pursuant to which the parties agreed to a revised implementation plan, revised fee schedule, revised procedures regarding Capgemini's staffing, and revised timeline to complete the Enterprise Solution.

56. As part of those negotiations, and in an attempt to salvage the project Outlet agreed to remove the ecommerce portion of the Enterprise Solution from the scope of the project.

Because Outlet is a retail-based company, this was an enormous concession and removed significant responsibility from Capgemini.

57.     At that time, Outlet expressed concerns about the fact that Capgemini was reaching its 45,000 hours of ICE (Integration and Customization Effort) Fees that it had represented would be needed to complete the Enterprise Solution.  As such, the First Amendment also contained detailed procedures regarding Capgemini's reporting and the payment of ICE Fees.

58.     In October 2018, almost two years after the First Amendment, and over three years after the project launch, Capgemini still had not achieved the promised functionality and the Enterprise Solution remained plagued with defects and integration problems.

## VI.     The Failed Go-Live Effort and CP-249

59.     Notwithstanding, in December 2018, Capgemini insisted that it had achieved the requisite milestones sufficient to receive payment and that the Enterprise Solution was ready for a "go-live" pilot test, meaning it could work in a live retail environment.  However, the Enterprise Solution was far from complete and defects rendered the "go-live" impossible.  For example, the Enterprise Solution could not even perform basic transactions like completing customer orders.

60.     A large part of the problem is that Capgemini was wholly unaware of the limitations of the NetSuite platform that was the foundation of its proposed cloud-based Enterprise Solution.  In order to conduct the "go live", Capgemini needed to load merchandise data to NetSuite.  Capgemini informed Outlet that the data load would take seven days, but the data load took seven weeks to complete.

61.     As a result, Outlet was forced to close the stores that relied on the pilot Enterprise Solution and was forced to rely on, and pay for, its Legacy Business System to keep its remaining stores operational and to be able to process customer orders.  Capgemini had promised Outlet this would not happen during implementation and transition of the Enterprise Solution. Ex. A at § 4.1.1.

62.     Capgemini's failure to achieve a "go-live" of the Enterprise Solution in late 2018 was also due to its decision to cut back on staff, including personnel in critical leadership roles in the weeks leading up to the "go-live" event.  In fact, critical Capgemini personnel simply disappeared in the days preceding the "go-live" event, leaving the remaining Capgemini personnel unaware of the project's history and unable to provide adequate assistance.

63.     Additionally, Capgemini intentionally manipulated input data so that its December 2018 pilot testing appeared to work.  However, when the pilot was tested with data representative of actual business needs, it did not work.  This could have been avoided if Capgemini had conducted tests in an actual production environment, which Outlet requested and even many members of Capgemini's team agreed was a good idea, but Capgemini refused in order to save costs.

64.     When Outlet raised these issues and the "go-live" problems with Capgemini, Capgemini took the incredible position that its failure to successfully complete the "go-live" event – and its failure to develop the Enterprise Solution – was due entirely to Outlet, stating "[t]o put it simply, to the extent the Pilot is not yet successful and the entire system is not in production, it is Outlet's fault."

65.     At this point, Outlet's payments to Capgemini far exceeded $19 million and Outlet was still relying on the SHC legacy system to operate its business.

66.     Also notwithstanding the failed "go-live" event, Capgemini invoiced Outlet as if it had achieved the requisite milestone to trigger payment with full knowledge that the work was not complete and the invoices were not justified.  Outlet disputed that the invoice was owed.

67.     In an attempt to address the myriad of problems with the Enterprise Solution, the Parties entered into Change Proposal (CP), CP-249, which was entered into as of December 14, 2018.  A copy of CP-249 is attached as Exhibit B.

68.     The intent of CP-249 was to identify some of the major issues relating to the functionality of the Enterprise Solution, finalize Build Deliverables, and change the criteria and timing for payment to Capgemini.  CP-249 also identified specific deliverables that Capgemini agreed to complete.

69.     CP-249 expressly addressed the importance of completing the Enterprise Solution in a timely manner. It "acknowledge[d] the importance of the Services set forth herein being completed by February 1, 2019."  Ex. B.

70.     Pursuant to CP-249, Outlet agreed to pay Capgemini $1,833,984 within two days of the Effective Date of the Change Proposal, which it did.

71.     CP-249 provided that Outlet make the remaining payment of $1,235,524 within two days of Capgemini achieving certain project milestones expressly set forth in CP-249, which were intended to address outstanding functionality issues, unresolved critical defects, and unfinished design, build and testing of development objects.

72.     Capgemini, however, had no intention of timely completing the deliverables in CP-249 or completing the deliverables in their entirety.  Despite its acknowledgment that time was of the essence in completing CP-249 and the February 1, 2019 target date for completion of that CP, Capgemini did not contact Outlet to discuss its proposed design documents for CP-249

until February 20, 2019, and postponed meetings with Outlet until late March 2019, at which time it finally provided draft design documents. Those design documents, however, were incomplete and proposed architecture that was untested and potentially unworkable in production.

73.     In April 2019, Capgemini attempted two more "go-live" events for the Enterprise Solution. However, neither "go-live" event was successful without manual interference.

74.     Capgemini also misrepresented that it had achieved the milestones set forth in CP 249. On June 4, 2019, four months after the February 1, 2019 target completion date in CP-249, Capgemini issued an invoice to Outlet for $945,581.80 claiming that it was owed payment pursuant to CP 249 for completion of the Enterprise Solution. It did so with full knowledge that that its system, as designed, could not be used to operate many aspects of Outlet's daily business operation, such as inventory management, pricing, and finance and accounting.

75.     However, the deliverables that were required by CP-249 were not complete. For example, the Enterprise Solution: (i) did not have basic retail functions such as point-of-sale credit card functions; (ii) was unable to perform price scraping functions, which enable Outlet to collect data on the pricing of its competitors; (iii) did not have an automated cancellation process in place; (iv) could not integrate with other Sears stores to process returns or manage merchandise; (v) was not able to successfully interface with Outlet's third party tax and carrier software; and (vi) did not allow consumers to view products in their entirety on the website.

76.     When Outlet disputed that CP-249 was complete, Capgemini acknowledged that there were defects in the Enterprise Solution, but claimed that, since Outlet could resolve some of those defects with a "manual workaround" CP-249 was complete.

77.     When confronted with its failure to provide the most basic solution design for obtaining customer signatures and confirming merchandise pick up, which were also required by CP-249, Capgemini conceded that it had not been completed.  Notwithstanding, Capgemini responded that it would need an additional change proposal to deal with those design problems "due to increased complexity".

## VII.    Capgemini's Breaches Cause Significant Damage to Outlet

78.     As a result of these delays, Outlet continued to incur significant costs for use of the Legacy Business System.  In addition, Outlet continued to incur costs from lost sales in stores that were transitioned to the Enterprise Solution due to ongoing defects and design issues with the Enterprise Solution.

79.     Many of the problems with the Enterprise System were due to the fact that Capgemini had misrepresented its experience, understanding, and the capability of a NetSuite-based solution as the foundation of the Enterprise Solution.  Among other things, Capgemini represented that its proposal to use a NetSuite was based on its "lessons learned doing similar separations."  In reality, Capgemini had never managed or developed an enterprise solution of this magnitude using NetSuite, a fact that it concealed from Outlet.

80.     As such, when it came time for Capgemini to implement its NetSuite-based solution, it lacked the expertise and know-how to properly configure and test the integration in a production environment, causing significant delays in the implementation of the Enterprise Solution and resulting in significant additional costs to Outlet.

81.     As of the date this Complaint was filed, Capgemini still had not resolved all of the defects and functionality issues with the Enterprise Solution.  To date, basic functionality needed to operate in a retail environment remains unavailable to Outlet and must be managed manually:

(i)     The software architecture continues to allow duplicate credit memos against identical transactions, which distorts financials and creates inventory accounting issues.

(ii)    There continue to be significant issues caused by the use of a NetSuite based solution. Outlet cannot manage inventory because different items are assigned the same SKUs. The store registers are at their maximum capacity for storing and retrieving merchandise data design flaw. Registers are routinely marked as "offline" and restoring each offline register takes 3-4 days.

(iii)   Sears Fusion (the connection between various Sears stores) will not go live and is not designed to mimic the legacy functionality. This has resulted in losses of $15,000 per day and the loss of customer discoverability on the sears.com platform.

(iv)    The Enterprise "Solution" is not integrated with third party software used to calculate sales taxes. Customers are presented with one sales tax amount at checkout, but charged a different sales tax when payment is processed.

(v)     The Enterprise "Solution" is not integrated with third party software for carrier delivery.

(vi)    There is no functionality allowing the use of a mobile or electronic device for signature upon merchandise pick up or delivery.

82.     In addition to these issues, the point-of-sale functions in the Enterprise Solution are woefully inadequate due to Capgemini design failures. As a result, transactions at the point-of-sale (the store register) can take up to 15 minutes to complete.

83.     Outlet has requested that Capgemini provide it with the architecture for the Enterprise Solution. While Capgemini has provided pieces of information related to discrete data flows, it has refused to provide the whole Enterprise Solution architecture to Outlet and contended it does not exist.

84.     Nevertheless, Capgemini demanded, and continues to demand payment on the basis that it had fulfilled its contractual obligations, including under CP-249, to provide a complete, functioning Enterprise Solution.

### VIII.    Capgemini Improperly Leverages the NetSuite Agreement

85.    Pursuant to the MSA, Capgemini was obligated to obtain proper licenses for use of NetSuite and other third party software that was necessary to operate the Enterprise Solution. Ex. A at § 16.7.

86.    Capgemini subsequently entered into an agreement with NetSuite for the benefit of Outlet (the "NetSuite Agreement").  That agreement specifically identified "SHO" as its exclusive beneficiary and specifically included Outlet within the definition of "SHO".

87.    The NetSuite Agreement also inured to the benefit of any successors or assignees and was assignable by Capgemini.

88.    Since 2015, Capgemini has invoiced Outlet for the NetSuite license pursuant to the parties' right under the NetSuite Agreement and Outlet has paid for, and used those licenses.

89.    Outlet is also the assignee and successor to Sears Hometown & Outlet, Inc. under the NetSuite Agreement.

90.    Capgemini engaged in discussions with NetSuite without Outlet's knowledge regarding Outlet's rights under the NetSuite Agreement.  During those discussions, Capgemini did not take the position that Outlet remained the exclusive beneficiary under the Agreement even though it continued to invoice Outlet for the services.

91.    Capgemini now contends that it has the right to terminate the NetSuite Agreement without consent from Outlet.

92.    Capgemini refuses to acknowledge its continuing obligation under the MSA to provide Outlet with access to a NetSuite license.

**IX.     Capgemini Refuses to Provide Termination Assistance**

93.     On January 17, 2020, Capgemini sent a termination notice to Outlet, claiming that it was in material breach of Section 15.6 of the MSA and that Capgemini was providing its 60-day notice pursuant to that provision.

94.     Sears has disputed all unpaid invoices related to the completion of CPs and Fees. There are no undisputed invoices that exceed the $500,000 threshold in Section 15.6 of the MSA, and Outlet is not in breach of the MSA. Capgemini does not have a right to terminate the MSA.

95.     Notwithstanding, upon termination Section 15.7.1 of the MSA requires Capgemini to provide Termination Assistance as set forth in an agreed upon Termination Plan "in connection with…any termination of this Agreement."  Ex. A at §§ 15.7.1-4.

96.     Termination Assistance includes:

> [T]he orderly transition and migration from Service Provider to the Customer, or the Customer's designee, of the Services then being performed by Service Provider.  Service Provider shall, and shall cause Service Provider Representatives to, cooperate in good faith with the Customer and perform Service Provider's obligations under Section 15.7 of the Agreement and under this Schedule ("Termination Assistance" or "Termination Assistance Services"), commencing on the date such Termination Assistance Services are requested by Customer for a period not to exceed twenty-four (24) months from such date ("Termination Assistance Period").  The Termination Assistance Services include, as requested by Customer during the Termination Assistance Period, the services, functions and responsibilities set forth below.  The Termination Assistance Services include the ongoing provision of the Services at the Service Levels agreed by the Parties under the Termination Plan (as defined below) to reflect the declining Service Provider resources and Customer-required volumes during the Termination Assistance Period.  The foregoing does not relieve the Service Provider of providing Services in accordance with existing Service Levels until the Termination Plan is agreed reflecting any agreed modifications to such Service Levels.

Ex. A, Schedule 16, p. 1.

97.     Capgemini is obligated to maintain its existing Service Levels until a Termination Plan is agreed upon.

98.     The parties promptly began negotiations on a Termination Plan pursuant to the MSA but have not been able to agree on the terms of such a Plan.

99.     Capgemini would not agree to any delays in implementing knowledge transfer or the duration of the Termination Plan due to the COVID-19 crisis and shelter in place orders.  The parties did not agree on the duration of the Termination Assistance or reporting requirements for Capgemini.  Capgemini also sought a broad indemnity, to which Outlet did not agree. Capgemini would also not agree to a plan that was contingent on ensuring the continuity of the NetSuite license.

100.    As part of the parties' negotiations towards a Termination Plan, Outlet insisted on continuity of the NetSuite license, which it has paid for, and used since 2015 as the foundation of the Enterprise Solution.  Capgemini would not agree to a plan that was contingent on ensuring the continuity of the NetSuite license.

101.    Nevertheless, on April 7, 2020, Capgemini confirmed that it was terminating the MSA for cause, and refused to negotiate a mutually agreeable Termination Plan. Instead, Capgemini insisted that Outlet abide by the terms of Capgemini's draft, unsigned termination plan with terms that were not acceptable to Outlet.

102.    On that same date, Capgemini took the position that it would terminate its agreement with NetSuite as of April 22, 2020 regardless of whether Outlet has a new agreement in place with NetSuite by that time.

## COUNT I
## FRAUDULENT INDUCEMENT

103. Outlet incorporates by reference the allegations set forth in the foregoing paragraphs as if fully set forth herein.

104. As set forth above, before Outlet entered into the MSA, in the contract itself, and during the term of the MSA, Capgemini made numerous misrepresentations of material facts, and failed to disclose material facts to Outlet regarding, among other things, Capgemini's purported abilities, skills, expertise, resources, knowledge of NetSuite and intention to perform and provide services in connection with the Enterprise Solution.

105. These misrepresentations were material, and made with the intent of misleading Outlet into relying upon them. In particular, Outlet entered into the MSA, agreed to make payments, extended the MSA numerous times through amendment and change proposals, and consented to other agreements – for example with NetSuite – that Outlet would not have done had Capgemini fully represented the material facts and disclosed all material facts within its possession.

106. Those representations were false, and Capgemini knew, or was reckless in failing to know, that such statements were false at the time they were made.

107. Also, as set forth above, during the course of its work on the Enterprise Solution, Capgemini made numerous misrepresentations of material facts, and failed to disclose material facts, regarding risks to the Enterprise Solution, the progress of its work, its services, its ability and intention to correct problems with the Enterprise Solution, its ability and intention to fulfill its contractual obligations to design, build, and implement the Enterprise Solution and the ability of the designed system to perform as required.

108.    Capgemini made those representations and concealed the nature of material facts in order to induce Outlet to hire Capgemini and execute the MSA, including subsequent Amendments, Change Proposals and Enhancement Requests, and Sears reasonably relied upon Capgemini's misrepresentations in selecting and hiring Capgemini.

109.    Outlet's reliance on these misrepresentations was justifiable.

110.    Outlet's reliance on Capgemini's misrepresentations caused injury to Outlet.

## COUNT II
## BREACH OF CONTRACT

111.    Outlet incorporates by reference the allegations set forth in the foregoing paragraphs as if fully set forth herein.

112.    On or about April 4, 2015, the parties entered into a valid, binding, and enforceable agreement, which was subsequently amended through the First Amended MSA and Change Proposals (collectively referred to as the "MSA").

113.    At all relevant times, Outlet discharged and substantially performed all of its obligations under the MSA.

114.    Under the terms of the MSA, even as amended to accommodate schedule delays, Capgemini was obligated to provide the complete and fully functioning Enterprise Solution.

115.    Capgemini never delivered a complete and fully functioning Enterprise Solution. Capgemini breached its obligations to adequately staff and manage the execution of the Enterprise Solution.  Capgemini also ceased performance of, and willfully abandoned, its contractual obligations under the MSA and certain CPs.

116.    By reason of its actions as set forth herein, Capgemini has intentionally, in bad faith, recklessly, and materially breached its express and implied duties under the MSA.

117.    Capgemini has also willfully abandoned its provision of Termination Assistance services that are explicitly required by the MSA, including providing Outlet with a license to the NetSuite Offerings and platform.

118.    The MSA allows for the enforcement of those Termination Assistance services by specific performance.  No adequate remedy at law exists for Outlet.  Outlet will suffer irreparable harm if preliminary relief is denied.  Outlet has a likelihood of succeeding on the merits of its demand for Termination Assistance.

119.    In addition to its express contractual duties, Capgemini had an implied duty in contract of good faith and fair dealing with respect to its performance of all aspects of its contract with Outlet.  That duty prohibited Capgemini from destroying or injuring Outlet's right to receive the fruits of its contract.  Capgemini breached its duty of good faith and fair dealing through the conduct described above, including, but not limited to, misleading Outlet regarding the cause of delays, failures, and cost overruns in Capgemini's work.  Capgemini violated its duties of good faith and fair dealing with respect to its contractual duties to report honestly, fully, and accurately, and to communicate honestly, fully, and accurately with Outlet.

120.    By its conduct, Capgemini breached its implied duty of good faith and fair dealing.

**COUNT III**
**CONSTRUCTIVE FRAUD**

121.    Outlet incorporates by reference the allegations set forth in the foregoing paragraphs as if fully set forth herein.

122.    Capgemini owed a duty to provide all material information regarding this project to Outlet in an accurate and complete manner.  The relationship between Outlet and Capgemini was not arm's length.  Capgemini knew and encouraged Outlet's dependence upon Capgemini to

provide the extremely complex and technical project skills, experience, and professional expertise that Outlet did not possess, and without which the development of the envisioned Enterprise Solution could not be accomplished.

123.    Capgemini also knew that Outlet did not have the expertise or information to fully evaluate the project risks and perils of which Capgemini was aware.  In the MSA and during the work on the Enterprise Solution, Capgemini consistently presented itself as a trusted expert and partner capable of, and fully committed to, successfully delivering the envisioned Enterprise Solution – the most complex IT project in Outlet's history.

124.    Capgemini understood and acknowledged that, by the very nature of the project, Outlet was required to place trust and confidence in Capgemini's IT systems and integration experts, who: (i) would have total access to all details of Outlet's business operations and business information systems; and (ii) would be Outlet's sole source of the arcane expertise, skills, and project experience necessary to create and implement the envisioned Enterprise Solution.  Capgemini also knew that Outlet did not possess Capgemini's proprietary information, expertise, or experience on such projects and could not independently evaluate Capgemini's performance or representations.

125.    Capgemini breached that duty by failing to disclose material information that had a tendency to deceive Outlet.

126.    Capgemini's breach of its duty caused injury to Outlet.

### COUNT IV
### INTENTIONAL NON-DISCLOSURE/FRAUDULENT CONCEALMENT

127.    Outlet incorporates by reference the allegations set forth in the foregoing paragraphs as if fully set forth herein.

128.    As set forth above, before Outlet entered into the MSA and, during the term of the MSA, Capgemini intentionally concealed material facts from Outlet.

129.    The facts that Capgemini knowingly concealed were material, and their intentional withholding was done with the intent of misleading Outlet.

130.    Outlet's reliance on the concealment of those facts was justifiable.

131.    Outlet's reliance on Capgemini's concealment of these facts caused injury to Outlet.

**COUNT V**
**DECLARATORY ACTION FOR EXCUSE OF NON-PERFORMANCE**

132.    Outlet incorporates by reference the allegations set forth in the foregoing paragraphs as if fully set forth herein.

133.    As of the date of the Complaint, Outlet still does not have a functional Enterprise Solution as contemplated by the MSA as amended.

134.    Capgemini has failed to perform its contractual obligation to deliver a functional Enterprise Solution and post-MSA Termination Assistance.

135.    Accordingly, Outlet requests that this Court declare that Outlet is excused from performance of its contractual obligation to pay any further invoices from Capgemini.

**JURY TRIAL DEMANDED**

Outlet demands a trial by jury.

**PRAYER FOR RELIEF**

WHEREFORE, Outlet demands specific performance from Capgemini of its obligation to provide Termination Assistance for up to 24 months and other injunctive relief that this Court deems appropriate.  Outlet also seeks judgment against Capgemini in an amount of actual damages and consequential damages including, but not limited to, compensation for payments

made by Outlet to Capgemini to correct defects and functionality issues, compensation for costs to Outlet associated with the maintenance of its Legacy Business Systems, and lost sales, as well as incidental damages yet to be fully determined, together with interest, attorneys' fees, costs, punitive damages in an amount to be fixed by a jury, and any other relief that this Court deems just and proper.

Dated: April 8, 2020

Respectfully submitted,

*/s/* Shima Roy

Shima S. Roy
Matthew G. Allison
Baker McKenzie LLP
300 E. Randolph St.
Chicago, Illinois 60601
(312) 861-8005